UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

VALENTIN KHAZIN,

                Plaintiff,

v

THE CITY OF NEW YORK, SYLVESTER GE, JOHN SANFORD, JOHNATHAN LIPKE, MARC LEVINE, STEPHEN BRATHWAITE, VINCENT GREANY, MICHAEL LAU, MICHAEL DIAZ, and DANIEL BROWN,

                Defendants.

**MEMORANDUM AND ORDER**
17-CV-3779 (LDH) (TAM)

---

L\ASHANN D\EARCY HALL, United States District Judge:

      Valentin Khazin ("Plaintiff") brings the instant action against the City of New York, Executive Officer, Highway District Sylvester Ge, Captain John Sanford, Highway Patrol Lieutenant Jonathan Lipke, Highway Patrol Lieutenant Marc Levine, Highway Patrol lieutenant Stephen Brathwaite, 9th Precinct Commanding Officer Vincent Greany, Lieutenant Michael Lau, Lieutenant Michael Diaz, and Lieutenant Daniel Brown (collectively, "Defendants"), asserting claims for retaliation under 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL"), and the New York City Administrative Code ("NYCHRL").[1] Defendants move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment to dismiss the complaint in its entirety.

---

[1] Plaintiff also brought a *Monell* claim but has voluntarily withdrawn that claim. (*See* Pl.'s Opp'n at 1, ECF No. 90-52.)

1

## UNDISPUTED FACTS[2]

Plaintiff is a former police officer sergeant with the New York Police Department ("NYPD"). ("Defs.' 56.1 Reply") ¶ 6, ECF No. 91-6.) On August 12, 2015, Plaintiff was assigned to NYPD Highway District 3 because there was a need for supervisory personnel. *(Id.* ¶ 4.) While on this assignment, Plaintiff reported directly to Defendant Lieutenant Marc Levine and Plaintiff's duties and responsibilities included monitoring and supervising police officers, ensuring that 911 calls were responded to, and completing administrative tasks. (*Id.* ¶¶ 5, 7.)

As a sergeant supervising police officers, Plaintiff supervised police officer Dana Harge. (*Id.* ¶ 6.) In August 2015, Defendant Levine informed Plaintiff that Officer Harge was a "troublemaker and harasses women" and instructed Plaintiff to not approve days off for Officer Harge. (*Id.* ¶¶ 12–13.) Defendant Levine also called Officer Harge a "liar" and "lazy" and checked on Officer Harge more than other officers. (*Id.* ¶ 14.)

Plaintiff observed Defendant Ge, the Executive Officer of the Highway District, treat Officer Harge "more harshly than other officers". (*Id.* ¶ 40.) Defendant Ge allegedly conducted investigations into Officer Harge, directed supervisors to closely supervise officer Harge, and monitored Officer Harge's timeliness. (*Id.* ¶¶ 15–16, 40.) Defendant Ge was assigned to the

---

[2] The following facts are taken from the parties' statements of material fact pursuant to Local Rule 56.1 and annexed exhibits. Unless otherwise noted, the facts are undisputed. However, another point bears emphasis. Many of the undisputed facts contained in the parties' joint Rule 56.1 Statement reflect a misunderstanding of the utility of a Rule 56.1 Statement—to aid the Court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information, in determining whether a trial is necessary. Thus, these facts are of little aid to the Court in deciding the instant motion. Specifically, Defendants include in their submission facts that simply state that Plaintiff "alleges" statements and conduct by Defendants without admitting or denying the underlying fact. (*See, e.g.*, Defs.' 56.1 Reply ¶ 12) ("Plaintiff *alleges* that Lt. Levine informed him in or around August 2015, that PO Dana Harge was a 'troublemaker and harasses women.'") (emphasis added); *see also id.* ¶ 13 ("During that conversation, plaintiff *alleges* that Lt. Levine instructed plaintiff not to approve days off for PO Harge while Lt. Levine was on vacation.") (emphasis added). The Court also notes that this is not first time it has encountered this problem with submissions by the Corporation Counsel of the City of New York. That said, for the purposes of this memorandum, any statement of fact merely restating an allegation made by Plaintiff will be deemed admitted.

Internal Affairs Bureau and was investigating Officer Harge after a female motorist filed a complaint against him for sexual harassment.  (*Id.* ¶ 17.)  Additionally, according to Defendants, Officer Harge was being closely monitored to ensure he was going to the Traffic Violations Bureau because he missed traffic court on prior occasions.  (*Id.* ¶ 18.)

Defendant Jonathan Lipke, an Integrity Control Officer, treated Officer Harge "more stringently" than other officers, repeatedly calling him into his office and conducting "daily checks" of officer Harge's assignments.  (*Id.* ¶¶ 23, 54.)  Defendant Stephen Brathwaite directed supervisors to closely supervise Officer Harge and conducted investigations into him.  (*Id.* ¶¶ 198.)  Defendant Sanford also closely supervised officer Harge and conducted investigations into him.  (*Id.* ¶¶ 204–07.)  While Officer Harge was on limited duty, Defendants John Sanford and Levine instructed Plaintiff to ensure Officer Harge had consistent work to do.  (*Id.* ¶ 20.)  When Plaintiff offered an alternative solution to this instruction, Defendants rejected it because Defendant Sanford wanted Officer Harge to be "constantly supervised" and to have "constant work to do."  (*Id.* ¶ 22.)

Notwithstanding Defendants' instructions, Plaintiff allowed Officer Harge a day off to attend his daughter's baseball game even though Defendant Levine directed him not to.  (*Id.* ¶ 45.)  Plaintiff also allowed Officer Harge to leave early even though he was instructed by Defendant Levine not to give Officer Harge time off.  (*Id.* ¶ 46.)

On November 30, 2015, Plaintiff's assignment tour was changed from the 5 a.m. to 2 p.m. shift to the 2 to 11 p.m. shift.  (*Id.* ¶ 42.)  Plaintiff's tour was change following an incident where he inaccurately filled out an absence form for another officer, which Defendants Levine and Lipke informed him constituted a falsification of records.  (*Id.* ¶ 47.)  Plaintiff does not dispute that he filled out a form for an officer who left early, but, on Plaintiff's telling, it was the

3

officer who forgot to place the time he left the command on the form and that filling out a form for an officer who left early was not against NYPD policy. (*Id.*) Once Plaintiff's tour had changed, the parties agree that Plaintiff asked Defendant Sanford to return him to his original tour, Defendant Sanford agreed, and in January 2016 Plaintiff was restored to his original tour. (*Id.* ¶¶ 48–50.)

Defendant Lipke began investigating Plaintiff in December 2015 after Sergeant Georgia Madouros filed a complaint with the Internal Affairs Bureau ("IAB"), alleging that Plaintiff engaged in unauthorized off-duty employment and used a police vehicle to do so. (*Id.* ¶ 73.) Defendant Lipke's duties included conducting covert investigations of officers under his supervision to ensure they were complying with NYPD policies, and that pursuant to these duties, Defendant Lipke followed Plaintiff to determine if he was engaging in unauthorized off-duty employment. (*Id.* ¶¶ 52–55.) Under the NYPD departmental rules, uniformed members are not permitted to work off-duty employment without submitting an off-duty application, undergoing an interview, and receiving prior written supervisory approval. (*Id.* ¶¶ 57–60.) Failure to follow departmental rules regarding off-duty employment can result in discipline. (*Id.* ¶ 65.) Plaintiff obtained permission from the NYPD to work at one company for 2015 and was aware that approved off-duty employment applications were only valid for a year. (*Id.* ¶¶ 71–72.) Yet, Plaintiff had worked off-duty at several different locations without obtaining prior written approval in 2015, 2016 and 2018. (*Id.* ¶¶ 66–72.) Plaintiff submitted five applications to engage in off-duty employment dated January 30, 2016, but they were not acted upon because Plaintiff had an open investigation into his conduct. (*Id.* ¶¶ 81–82.) Because Plaintiff's applications were not denied, Plaintiff believed they were approved. (*Id.* ¶¶ 55, 66–72.)

4

Defendant Lipke's investigation concluded on March 30, 2016.  (*Id.* ¶ 74.)  The next day, Defendant Lipke issued a final investigatory report where Plaintiff was found to have engaged in unauthorized off-duty employment, failed to supervise, and violated departmental rules and procedure.  (*Id.* ¶¶ 74–76.)  Defendant Lipke recommended that Plaintiff be transferred from Highway 3.  (*Id.*)

Sometime in June 2016, Defendant Ge began monitoring Plaintiff's vehicle movements because he believed that Plaintiff was again engaging in off-duty employment while on duty.  (*Id.* ¶ 83.)  Defendant Ge observed that Plaintiff was off post at a bakery with Officer Harge for an extended period of time.  (*Id.* ¶¶ 84–86.)

On June 6, 2016, Plaintiff was transferred from Highway 3 to the 9th precinct.  (*Id.* ¶ 89.)  Once reassigned to the 9th Precinct, Plaintiff filed a complaint with the NYPD's Office of Equal Employment Opportunity ("EEO") on June 29, 2016, alleging that he believed Defendant Lipke was issuing Officer Harge unwarranted command disciplines.  (*Id.* ¶¶ 25, 27.)  The NYPD EEO investigated Plaintiff's June 29, 2016 complaint and concluded that it was unsubstantiated.  (*Id.* ¶ 28.)  According to Plaintiff, he was denied a drug trafficking training at an unspecified time following his June 2016 EEO complaint.  (*Id.* ¶ 90.)

On August 22, 2016, the Transportation Bureau Investigation Unit issued a command discipline against Plaintiff, known as a "B" command discipline.  (*Id.* ¶ 77.)  A command discipline is a written disciplinary measure that can result in the loss of up to ten vacation days.  (*Id.* ¶ 31.)  The B command discipline was issued against the Plaintiff as a result of the investigation into his on- and off-duty activities.  (*Id.* ¶ 86.)  Specifically, the command discipline found that Plaintiff failed to account for the whereabouts of an officer under his command, that Plaintiff inaccurately completed a leave of absence report when the officer left

5

the shift early, that Plaintiff engaged in unauthorized off-duty employments between summer of 2014 and February 2016, that Plaintiff conducted a vehicle stop on November 10, 2015 without notifying the Communication Division, and that Plaintiff failed to supervise four officers during the Veterans Day parade detail on November 11, 2015. (*Id.* ¶ 77.) As a punishment for these indiscretions, Plaintiff was docked ten days of pay. (*Id.* ¶ 282.) Plaintiff accepted the disciplinary action and punishment. (*Id.* ¶¶ 78–79, 283.)

On November 1, 2016, Plaintiff filed a second EEO complaint for retaliation, alleging that Defendant Lipke visited the 9th Precinct in September 2016, and after the visit, Plaintiff was deprived overtime and served with charges and specifications issued by Defendant Lipke and Defendant Ge. (*Id.* ¶¶ 92–93.) Despite his claims in his EEO complaint, Plaintiff earned more overtime than other sergeants in the 9th Precinct in 2016. (*Id.* ¶ 94.) Plaintiff also was assigned to more details after he filed his complaint. (*Id.* ¶ 95.)

On November 7, 2016, less than a week after Plaintiff filed his EEO complaint, Plaintiff was placed on Level I – Performance Monitoring by Inspector Cosgrove, the commanding officer of the Performance Analysis Section. (*Id.* ¶ 99.) As a result of Plaintiff's placement on Level I – Performance Monitoring, Defendant Greany switched Plaintiff to a day tour. (*Id.*¶ 101.) On December 19, 2016, Plaintiff supplemented his November 1, 2016 complaint of retaliation to include claims that Defendants placed him on performance monitoring and day tours, scrutinized, him and gave him undesirable assignments. (*Id.* ¶ 98.) According to Plaintiff, that he was no longer invited to attend commanding officer meetings after his November 1 EEO complaint. (*Id.* ¶ 96.)

The NYPD EEO investigated Plaintiff's November and December complaints, and determined on March 16, 2017, that there was no evidence of retaliation. (*Id.* ¶ 110.) Following

6

Plaintiff's December 19, 2016 EEO supplemental complaint, he claims that he received three unspecified, minor violations but they did not result in any discipline. (*Id.* ¶ 109.)

On February 24, 2017, Plaintiff filed a retaliation complaint with the IAB, which was referred to the NYPD EEO. (*Id.* ¶ 111.) In that complaint, Plaintiff claimed he was retaliated against for his prior EEO complaints and that he did not receive overtime or was delayed being paid overtime. (*Id.* ¶ 112.) Plaintiff sometimes was not paid overtime on time dating back as early as January 2, 2015. (*Id.* ¶ 119.) On April 18, 2017, The NYPD EEO notified Plaintiff that it found no evidence of retaliation because it had determined that Plaintiff had been paid for the overtime he earned in January and that any delay in payment was the result of Plaintiff's failure to timely submit his overtime slip. (*Id.* ¶ 117.) Three days after filing his retaliation complaint with the IAB, on February 27, 2017, Plaintiff requested to transfer to the Central Park Precinct, which Defendant Greany recommended him for on March 8, 2017. (*Id.* ¶¶ 120–21.)

On June 11, 2017, Plaintiff appealed the rating he received on his annual performance review. (*Id.* ¶ 128.) For the officer "rating period" from January 2016 to December 2016, Plaintiff received a "3" rating on his annual performance evaluation. (*Id.* ¶¶ 127.) As a result of that appeal, Defendant Greany increased Plaintiff's rating to 3.5. (*Id.* ¶ 128.) Plaintiff appealed his 3.5 rating, but that appeal was denied. (*Id.* ¶129.) Although Plaintiff had received 3 and 3.5 ratings prior to this annual evaluation, this was the first time he appealed an evaluation rating. (*Id.* ¶¶ 131–32.)

On September 15, 2017, Plaintiff filed an anonymous complaint with the IAB alleging that Defendant Lau, Plaintiff's supervisor at the 9th Precinct, was engaged in a hit and run accident while intoxicated. (*Id.*¶ 136.) On September 27, 2017, Plaintiff was interviewed about the submission of the anonymous complaint and for unauthorized off-duty employment he was

7

suspected to have engaged in. (*Id.* ¶¶ 122, 135.) During this investigation, Plaintiff admitted to engaging in off-duty employment while on sick report and that he submitted an anonymous complaint to the IAB claiming his supervisor at the 9th Precinct was involved in a hit and run accident while intoxicated. (*Id.* ¶¶ 135–37.) Plaintiff also conceded that he did not witness the events in the anonymous complaint and had no knowledge that they in fact happened. (*Id.* ¶ 137.)

On February 18, 2018, while the investigation into his anonymous complaint and off-duty activities was ongoing, Plaintiff applied to two positions within the 9th precinct, Field Training Sergeant and a Highway Safety Sergeant. (*Id.* ¶ 455.) Plaintiff did not receive either position. On June 27, 2018, the Patrol Borough Manhattan South Investigations Unit determined that Plaintiff's anonymous complaint was unfounded. (*Id.* ¶ 138.) On October 11, 2018, Plaintiff was suspended without pay for 30 days as a result of the investigation. (*Id.* ¶ 134.) Additionally, on October 24, 2018, Plaintiff was issued with charges and specifications for engaging in off-duty employment without authorization and permission on several occasions and was served on December 11, 2018. (*Id.* ¶¶ 143–44.)

When Plaintiff returned from his suspension on November 11, 2018, he was placed on modified assignment to the Housing Borough Bronx/Queens VIPER 21-unit, reporting to Defendant Lieutenant Lawrence Hawkins. (*Id.* ¶¶ 145–46.) On November 26, 2018, Defendant Hawkins issued a command discipline to Plaintiff for failing to account for a uniformed member of service on two dates. (*Id.* ¶ 149.)

Plaintiff resigned on March 15, 2019, from the NYPD. (*Id.* ¶ 151.) On December 19, 2016, Plaintiff filed a charge of retaliation with the New York State Division of Human Rights and then commenced the instant action on July 18, 2017. (*Id.* ¶¶ 152–154.)

**STANDARD OF REVIEW**

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant[s] are entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The movants bear the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 23 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Where the non-movant bears the burden of proof at trial, the movants' initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim. *Celotex Corp.*, 477 U.S. at 325. Once the movants meet their initial burden, the non-movant may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 250; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). The Court is to believe the evidence of the non-movant and draw all justifiable inferences in his favor, *Anderson*, 477 U.S. at 255, but the non-movant must still do more than merely assert conclusions that are unsupported by arguments or facts. *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996).

**DISCUSSION**

**I.     Retaliation Claims Under Section 1983, Title VII, NYSHRL, and NYCHRL**

Title VII "forbids an employer to retaliate against an employee for, *inter* alia, complaining of employment discrimination prohibited by Title VII." *Kessler v. Westchester Cnty.*, 461 F. 3d 199, 205 (2d Cir. 2006). The NYSHRL and NYCHRL similarly make it unlawful for an employer to retaliate or discriminate against an employee because he or she has

9

opposed a practice that is forbidden under those statutes. *See* N.Y. Exec. Law § 296(7); N.Y.C. Admin. Code § 8–107(7).

To establish a retaliation claim under Title VII, Plaintiff must first establish that he: "(1) "participat[ed] in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir. 2001)). If a Plaintiff meets this initial burden, the Defendant must "articulate a legitimate, non-retaliatory reason for the adverse employment action," and if Defendants offer such proof, the Plaintiff must "show that retaliation was a substantial reason for the adverse employment action." *Id.* at 173–74. The same standard for retaliation claims under Title VII also applies to retaliation claims pursuant to Section 1983 and the NYSHRL. *See Conklin v. Cnty. of Suffolk*, 859 F. Supp. 2d 415, 424 (E.D.N.Y. 2012) (Section 1983); *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (NYSHRL). Retaliation claims under the NYCHRL are analyzed under the *McDonnell Douglas* burden-shifting framework, but they are reviewed "more liberally" than federal law claims. *See Dillon v. Ned Management, Inc.*, 85 F. Supp. 3d 639, 661 (2015) (finding that "[i]n contrast to Title VII, NYCHRL does not require a plaintiff to establish that she incurred an 'adverse employment action' in order to support a retaliation claim; rather, it requires only a showing that the event was 'reasonably likely to deter a person from engaging in protected activity.'"). Under that standard, a jury must "reasonably conclude" that the alleged conduct by the employer was "reasonably likely to deter a person from engaging in protected activity." *Fincher v. Depository Tr. And Clearing Corp.*, 604 F.3d 712, 723 (2d Cir. 2010).

10

As a threshold matter, there is no dispute that Plaintiff engaged in three separate instances of protected activity, when he filed formal complaints of discrimination on June 29, 2016, November 1, 2016, and February 24, 2017.[3] (*See generally* Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem."), ECF No. 89-78.) Plaintiff claims, however, that Defendants retaliated against him even before he filed a formal complaint, when he refused to follow instructions that he believed treated Officer Harge unfairly. (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") at 14, ECF No. 90-52.) Defendants contend that Plaintiff's refusal to follow his superiors' instructions does not constitute protected activity. (Defs.' Mem. at 5.) The Court agrees.

To qualify as a protected activity, "an employee must have a good faith, reasonable belief that the challenged actions violated the law." *Bamba v. Fenton*, 758 F. App'x. 8, 13 (2d Cir. 2018) (citing *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013)). A plaintiff's belief is not considered reasonable because "she complains of something that appears to be discrimination in some form", but rather the *employer* "must be able to reasonably understand that the complaint was directed at conduct prohibited by Title VII." *Id.* at 12-13 (citing *Kelly*, 716 F.3d at 15–17).

Plaintiff's refusal to follow the alleged directives of his supervisors was not a form of protest that would put Defendants on notice that he was refusing their orders because they were discriminatory. Plaintiff never complained about the alleged discriminatory or retaliatory behavior he observed on behalf of Officer Harge or himself prior to June 29, 2016, when he filed his EEO complaint. (Defs.' 56.1 Reply ¶¶ 25–27.) And, there is no evidence in the record that

---

[3] Plaintiff does not contend that his December 19, 2016 EEO supplemental complaint constituted protected activity and has therefore abandoned any claim that he suffered retaliation as a result of that complaint.

11

Defendant Levine, who directed Plaintiff to discipline Officer Harge, knew that Officer Harge had filed an EEO complaint. Therefore, Plaintiff's refusal could not have put Defendants on notice that he was opposing discrimination. *See Filippi v. Elmont Union Free Sch. Dist. Bd. of Educ.*, No. 09-CV-4675 JFB ARL, 2012 WL 4483046, at *16 (E.D.N.Y. Sept. 27, 2012) ("The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally.") (internal quotation marks and citation omitted)).

Plaintiff's reliance on *Villavicencio v. Gure-Perez*, 56 F. Supp. 3d 178 (E.D.N.Y. 2014), cannot transform his refusal to follow orders into protected activity. In *Villavicencio*, an assistant principal brought a Section 1983 retaliation claim against the principal under whom she worked, asserting that the principal retaliated against her for refusing to promote racial discrimination. *Id.* at 189. The court held that the plaintiff's refusal to provide older African American teachers with unjustified ratings, and her suggestion to the principal that she provide these teachers with more lead time before formal observations and evaluations, was protected activity for purposes of her retaliation claim. *Id.* Given that the principal "had already aggressively retaliated against another assistant principal . . . for complaining about [the principal's] proclivity for racist thinking, . . . plaintiff has satisfied the burden of establishing [the plaintiff's] awareness of a protest." *Id.* at 190.

Here, by contrast, the record fails to demonstrate that Defendant Levine had a history of engaging in discriminatory conduct as to put him on notice that Plaintiff's refusal to follow his orders constituted an informal protest against discrimination. Plaintiff has failed to raise a genuine dispute of material fact that his refusal to discipline Officer Harge was protected

12

activity. As a result, Plaintiff's transfer from Highway 3 to the 9th precinct in June of 2016 did not constitute retaliation.

But that does not end the inquiry. Plaintiff raises eight adverse employment actions taken by Defendants that he argues were done in retaliation for his formal complaints: Defendants (1) gave him a poor annual evaluation, (2) denied Plaintiff's applications for two position in lieu of a less senior and less qualified sergeants, (3) denied Plaintiff a training opportunity, (4) did not invite him to attend commanding officer meetings, (5) delayed payment of Plaintiff of overtime, (6) launched an investigation into Plaintiff's off-duty activities, (7) issued a B command discipline against Plaintiff, and (8) disciplined him by placing him on Level I Monitoring. (Pl.'s Mem. at 16–19.) Defendants do not dispute that many of these actions could constitute adverse employment actions. However, they contend that (1) the rating Plaintiff received for his performance evaluation, (2) the denials of his applications for two sergeant positions, (3) the purported denial of his training request, and (4) his non-attendance at commanding officer meetings are not adverse employment actions. (Def.'s Mem. at 12–15.) The Court agrees.

In *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), the Supreme Court clarified a plaintiff's burden in demonstrating whether an employment action was materially adverse in the retaliation context. The Court held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal citations and quotation marks omitted); *see also Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006) (noting that *Burlington* announced a different standard of material adversity than that previously employed in this Circuit in, for example, *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)).

13

However, "[t]he requirement of a materially adverse employment action reflects the principle that 'Title VII does not protect an employee from all retaliation, but only retaliation that produces an injury or harm.'" *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24–25 (2d Cir. 2014) (quoting *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 569 (2d Cir. 2011)).

As to Plaintiff's first claimed adverse employment action, Plaintiff claims he received "a poor performance evaluation [that] could very well deter a reasonable worker from complaining." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 92 (2d Cir. 2015). Here, however, there is simply no evidence that Plaintiff's 2016 ratings of 3 and 3.5 reflected a poor performance evaluation when considered against his past performance. *See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (noting that, in evaluating whether employment action is materially adverse, "some actions may take on more or less significance depending on the context"). In fact, the record shows that Plaintiff had received 3 and 3.5 ratings on his evaluations in prior years. (Defs.' 56.1 Reply ¶¶ 131–32.); *cf. Byrne v. Telesector Res. Grp., Inc.*, 339 F. App'x. 13, 17 (2d Cir. 2009) (concluding that because satisfactory performance evaluation was still positive, it was not adverse employment action in Title VII retaliation context, even though evaluation was lower than in previous years). Therefore, Plaintiff has not shown that a reasonable employee in his position would have been dissuaded from making or supporting a charge of discrimination based on his 2016 performance evaluation.

With respect to the second adverse employment action Plaintiff claims, that he was denied the Highway Safety and Field Training Sergeant positions, there is no evidence in the record that there was an open position that Plaintiff could transfer into or that Plaintiff was

14

qualified or more qualified than others for any of the positions he sought. Nor is there evidence that the denials disadvantaged Plaintiff in any way. *See e.g.*, *Witek v. City of New York*, No. 12 Civ. 981 (CBA), 2019 U.S. Dist. LEXIS 229703 at \*26–27 (E.D.N.Y. Mar. 12, 2019) (finding refusal by the plaintiff's employer to transfer her to another unit in the hospital was not an adverse employment action). Thus, the denials of Plaintiff's applications are not materially adverse employment actions that might have dissuaded a reasonable employee from making or supporting a charge of discrimination.

Nor has Plaintiff provided evidence of the third adverse employment action, that Defendants denied him training. The only support that Plaintiff can muster for that claim is his own testimony, was that he was put on a six-month waitlist for a drug trafficking training program. (Defs.' Ex. B at 249:1–7, ECF No. 89-6.) That alone, however, is not a denial. Because the record is devoid of any evidence that Plaintiff was ever denied the drug trafficking training program he sought or that he was entitled to receive it, Plaintiff has not shown that this constituted a materially adverse action. Similarly, Plaintiff's fourth adverse employment action, that he did not receive an invitation to attend commanding officer meetings, even if true, does not rise to the level of an adverse employment action. *See, e.g.*, *Mahoney v. Donovan*, 824 F. Supp. 2d 49, 61 (D.D.C. 2011) (holding that the "triviality" of not being invited to an office holiday party is "precisely the kind of petty slight or minor annoyance" that are not "materially adverse" and cannot form the basis for a Title VII claim for retaliation).

Given that Plaintiff has not adduced sufficient record evidence that he suffered the first four adverse employment actions, they cannot support a viable retaliation claim. What remains are (5) Plaintiff's delayed overtime payments, (6) Defendants' investigation into Plaintiff's off-duty activities, (7) the B command discipline issued against Plaintiff, and (8) Plaintiff's

15

placement on Level I – Performance Monitoring.  Even assuming these remaining incidents constitute adverse employment actions, Defendants maintain that Plaintiff cannot establish a causal link between his protected activity and these actions taken against Plaintiff.  (Defs.' Mem. at 15–16.)  Here, again, Court agrees.

To establish a causal connection to support a retaliation claim, a plaintiff must show that the protected activity "was closely followed in time by the adverse [employment] action." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) (internal quotation marks and citation omitted).  Although the Second Circuit has not "drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," the Court typically has held that more than two months breaks the causal chain.  *Id.*; *see also Marinacci v. United States Postal Service*, 403 F. Supp. 3d 116, 130–131 (2d Cir. 2017) (stating that "district courts in this Circuit have 'consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation.'") (internal citation omitted).

Regarding the fifth adverse employment action, his delayed overtime payment, the denial of overtime certainly falls within the definition of materially adverse actions that satisfy that element of a retaliation claim.  *See Huaman v. Amer. Airlines Inc.*, No. 00-CV-6336 FB MDG, 2005 WL 2413189, at *7 (E.D.N.Y. Sep. 29, 2005).  There is no dispute, however, that Plaintiff experienced issues with late overtime payment as early as January 2015, more than a year before

16

his first protected activity took place in June 2016.[4]  (Defs.' 56.1 Reply ¶ 119.)  Moreover, the record shows that any delay in Plaintiff's overtime payments may have resulted from Plaintiff's own errors in submitting his overtime slips.  (*Id.* ¶ 117.)  As such, Plaintiff has not demonstrated that the delays in his overtime payments were connected in any way to his EEO and IAB complaints.

Plaintiff claims that the sixth and seventh adverse employment actions, Defendant Lipke's investigation into his off-duty activities and the B command discipline issued against Plaintiff as a result of that investigation, were part of a series of unwarranted disciplinary actions in as a response to Plaintiff's EEO complaints.  (Pl.'s Opp'n at 20.)  However, Plaintiff's first protected activity took place on June 29, 2016, when he filed a complaint on behalf of Officer Harge.  This complaint was filed well after Defendant Lipke's investigation began in December 2015.  Thus, Defendant Lipke's investigation cannot have possibly been initiated in retaliation for Plaintiff's protected activity.  *See Matthew v. JPMorgan Chase Bank, N.A.*, No. 17-CV-3594 (RRM) (ARL), 2020 WL 2523064, at *6 (E.D.N.Y. May 18, 2020) (finding no causal connection to support retaliation claim where the plaintiff did not file a charge of discrimination until three months after adverse employment action).  Because there is no dispute that the B command discipline was issued, in part, as a result of Defendant Lipke's investigation, (Defs.' 56.1 Reply ¶ 86), that action, too, lacks a causal connection to Plaintiff's protected activity.

---

[4] Plaintiff also claims that other "similarly situated" sergeants who held lesser rankings than Plaintiff earned as much as $70,000 more income than Plaintiff from 2016 to 2018.  Plaintiff points to his Exhibit 34, (ECF No. 90-35), to substantiate his claim.  However, that exhibit is woefully deficient, as it does not contain any information regarding the comparators' employment statuses or show how many overtime hours the comparators worked or on what dates they worked those hours.  Therefore, Plaintiff has not raised a genuine dispute on this issue.

17

Plaintiff has also failed to demonstrate that his eighth and final adverse employment action, his placement on Level I – Performance Monitoring, was tied in any way to his protected activity. Although Plaintiff was placed on Level I – Performance Monitoring within a week of his November 2016 EEO complaint, there is no evidence whatsoever that Inspector Cosgrove, who was responsible for placing Plaintiff on Level I – Performance Monitoring, was aware of Plaintiff's prior complaints. *See Watson v. Richmond Univ. Med. Ctr.*, 408 F.Supp.3d 249, 268 (E.D.N.Y. 2019) (holding that plaintiff could not establish prima facie case of retaliation where plaintiff failed to establish that the defendants were aware of the plaintiff's EEO complaint until after her termination).

\*            \*            \*

In sum, Plaintiff has not demonstrated a prime facie case of retaliation by Defendants as a result of any protected activity.

## II.  Constructive Discharge Claim

Defendants argue that Plaintiff cannot sustain a constructive discharge claim because no allegations support an inference that Defendants created an intolerable work environment at the time of his resignation in March 2019. (Defs.' Mem. at 18–22.) The Court agrees.

A constructive discharge of an employee "occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 92 (2d Cir. 1996). To prove a constructive discharge claim under federal and New York law, a plaintiff must "show both (1) that there is evidence of the employer's intent to create an intolerable environment that forces the [plaintiff] to resign, and (2) that the evidence shows that a reasonable

18

person would have found the work conditions so intolerable that he would have felt compelled to resign." *Shultz v. Congregation Shearith Isr. of the City of N.Y.*, 867 F.3d 298, 308 (2d Cir. 2017) (internal citation omitted); *see Mascola v. City Univ. of N.Y.*, 787 N.Y.S.2d 655, 655 (NY. App. Div. 1st Dep't 2005) (noting that "employment violations under the [NYSHRL]"—including constructive discharge—"are keyed to federal standards"); *see also Anyachebelu v. Brooklyn Hosp. Ctr.*, No. 16 CV 3159 (DLI)(VMS), 2017 WL 9511073, at *16–17 (E.D.N.Y. July 20, 2017) (observing that the constructive discharge analysis applies to constructive discharge claims brought under the NYSHRL and the NYCHRL). "

Plaintiff claims that he was forced to retire because he believed that the retaliatory acts of defendants would not cease. (*See* Defs' 56.1 ¶¶ 150–51.) However, nothing in the record supports that claim. At least four months lapsed between Plaintiff's retirement on March 15, 2019, and the command discipline he received on November 26, 2018, the last evidence of any adverse action taken against Plaintiff. The record is therefore devoid of any evidence that any actions taken by Defendants in 2018 or 2019 could be perceived as making his discharge "a forgone conclusion" considering Plaintiff's last protected activity took place in 2017. *Cf. Borrero v. Am. Exp. Bank Ltd.*, 533 F. Supp. 2d 429, 441 (S.D.N.Y. 2008) (holding that evidence suggested a constructive discharge where it showed that plaintiff reasonably believed her termination was a "foregone conclusion"); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987) (employer's statement that a plaintiff "would be fired . . . no matter what he did" held to be sufficient on its own to establish constructive discharge); *Cronin v. St. Lawrence*, No. 08–CV–6346 (KMK), 2009 WL 2391861, at *4 (S.D.N.Y. 2009) (denying a motion to dismiss retaliation claim where plaintiff alleged he resigned because he "did not feel that he had any alternative").

19

## CONCLUSION

For the aforementioned reasons, Defendants' motion for summary judgment is

GRANTED.

                                                                 SO ORDERED.

Dated: Brooklyn, New York            /s/ LDH
       March 29, 2024                  LaSHANN DeARCY HALL
                                           United States District Judge